**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

     v.

REGINALD WILLIS,

        Defendant.

REPORT AND
RECOMMENDATION
05-CR-6123

## Preliminary Statement

Currently before the Court is the defendant Reginald Willis'
(hereinafter defendant or Willis) motion to suppress evidence and
statements. (Docket #13).  The Government filed papers in opposition
to this motion. (Docket #14).  A suppression hearing was held on
November 16, 2005 and December 9, 2005.  By Order of Judge David G.
Larimer, dated September 6, 2005, all pre-trial motions have been
referred to this Court pursuant to 28 U.S.C. §636(b)(1)(A)-(B).
(Docket #10).  The following is my Report and Recommendation as to
defendant's motion.

## Factual Background

The Government's Proof: On June 29, 2005, at approximately 9:00
p.m., Rochester Police Officers Thomas Tasick, Joseph Briganti, and
Michael Houlihan assisted in the execution of a search warrant at
140 Weld Street in Rochester, New York.  See Transcript of November
16, 2005 Suppression Hearing [hereinafter "T1"] at 13 (Docket #26);

Transcript of December 9, 2005 Suppression Hearing [hereinafter "T2"] at 4, 22 (Docket #21).   Officer Houlihan prepared the affidavit in support of the warrant application based upon information from a confidential source that an individual was selling narcotics from that location.   T2 at 23.   In addition, Officer Houlihan had staged three controlled narcotics purchases at 140 Weld Street on June 16th, June 24th, and just an hour before executing the warrant to confirm that the drugs were still there. T2 at 25-26.   During his investigation, Houlihan determined that Willis resided at 140 Weld Street and obtained a physical description of him as a large-framed black male over six feet tall. T2 at 23-24.   Houlihan provided this description and a photograph of Willis to the other officers during the pre-warrant briefing.   T2 at 25.

After arriving at 140 Weld Street, the officers secured the dwelling.   Although Willis was not found inside, the two women who were present were handcuffed and detained while the search was conducted.   T1 at 14.   While searching a bedroom and adjacent utility closet, Officer Tasick found a white powdery substance resembling crack cocaine on a plate and a loaded rifle inside the closet.   T1 at 15.   Tasick also found mail and a checkbook printed with the defendant's name and the address of 140 Weld Street.   Id. In a cigar box underneath the bed, Tasick found unused plastic zip lock bags, commonly used to package cocaine, and in the top drawer of the night stand he found two rounds of ammunition.   T1 at 16.

While Tasick and others were inside the house executing the search warrant, Officer Briganti exited the dwelling to return his vest to the officers' van parked directly outside. T2 at 5. While outside, Briganti observed a group gathering at the corner and he asked them to disperse for officer safety purposes. T2 at 5. As Briganti walked back towards 140 Weld Street, he observed an older dark colored vehicle drive up and stop in front of the house. T2 at 5-6. Briganti approached the vehicle and saw that the driver, later identified as Willis, had his window down. T2 at 7. Briganti asked Willis where he was going because Briganti did not want him to park near the dwelling while the search was in progress. T2 at 7. Willis pointed to 140 Weld Street and said "I'm going there." Id. Briganti responded: "No you are not" and asked the defendant if he lived in the house and Willis answered "yes." T2 at 8. At some point during this outside encounter, Briganti noticed that the driver matched the description of the narcotics seller given during the pre-search briefing. T2 at 9. Briganti ordered Willis out of the vehicle, handcuffed him, brought him into the house, and turned him over to Officer Houlihan. T2 at 9-10.

Houlihan also recognized Willis from his photograph. At the point when Officer Houlihan took custody of Willis, the gun and cocaine had already been located in the residence and Sergeant David Giudinski directed Officer Tasick to search Willis. T1 at 17-19; T2 at 28-29. During the search, Tasick found a key in defendant's pocket and a plastic sandwich bag containing 66 smaller zip lock

3

bags filled with cocaine, inside the front of defendant's underwear. T1 at 17.

Willis was then transported by a uniformed officer in a marked police vehicle to the Public Safety Building where Officer Vincent Post advised him of his <u>Miranda</u> rights. T1 at 28, 46. Defendant said that he understood his rights and agreed to waive them. T1 at 29. Officer Post proceeded to interview defendant and write down his statements. T1 at 30. At the end of the interview, Officer Post read the statement back to defendant, who confirmed that it was truthful and signed it. T1 at 30 (<u>see</u> Government's Exhibit 2). In his statement, defendant admitted possessing 30-40 bags of crack-cocaine which he intended to sell. <u>See</u> Exhibit 2. According to Officer Post, at no time during the interview did defendant indicate that he wanted to terminate it nor did he request an attorney. T1 at 32.

<u>The Defense Proof</u>:   The defendant testified at the suppression hearing. Willis stated that on June 29, 2005, he was living at 23 Anthony Street and was in the process of moving from his apartment at 140 Weld Street because his lease expired the next day. T2 at 44-45. According to Willis, he stopped living at 140 Weld Street on February 22, 2005, but left his things there in boxes and continued to pay the utility bills for that apartment. T2 at 62, 64, 67.

Willis testified that at approximately 9:00 p.m. on June 29, 2005, he drove to 140 Weld Street to clean the apartment. T2 at 47. As Willis pulled up in front of the house, he saw police but did not

think much of it because it is a "high risk drug activity area."  T2
at 46-47.  As he parked the car, a police officer approached and
asked him where he was going.  T2 at 47.  Willis replied "right
there" and pointed to his house.  T2 at 48.  He told the officer
that he lived there and the officer ordered him to exit his car.
Id.  Willis testified he was then handcuffed and within "two or
three minutes" was inside his house.  T2 at 70.  No search was of
his person was conducted initially.

When he arrived inside the residence, Willis testified that he
"saw an officer come out of my bedroom with a rifle."  T2 at 48.
The officers told Willis that drugs were being sold out of his house
and they had a search warrant.  Id.  Willis remained in handcuffs
during the search.  After "20 minutes to a half hour, they [the
police] took me in the kitchen and went through my pockets."  T2 at
48-49.  Crack cocaine was found during the search of his person.  T2
at 70.  According to Willis, he did not initially realize that the
men in his house were law enforcement officers.  T2 at 71-72.
Willis testified that he "never saw police officers with black masks
on" because he had never before "lived in a drug infected area where
[he] had to see that."  T2 at 71.

The defendant testified that after the search, he was taken to
the police station by a uniformed officer, placed in a small room
and one of his hands was handcuffed to the bottom of a chair.  T2 at
50-51.  This proved to be very uncomfortable because of his height.
(Willis testified that he is six feet, seven inches tall.  T2 at 51,

77).  According to Willis, a man with a ski mask came into the interview room, but did not identify himself. T2 at 52.  The masked man said to Willis "you don't look like no gangbanger" and Willis replied that he was not. T2 at 52.  Willis testified that he feared being considered a "gangbanger" by the police because "gangbangers and police don't get along." T2 at 53, 81.  The defendant testified that he thought the masked man was going to kill him because he was in possession of drugs. T2 at 53.  Willis conceded that he was not sure whether he was given his <u>Miranda</u> warnings as "he didn't hear anything" because he was so scared. T2 at 54, 79.  Willis testified that he truly believed that the masked man was going to "do something bad" to him because "you have a mask on to hide your identity."  T2 at 55.

On cross examination, Willis acknowledged that (1) he had been brought to a police station for post-arrest questioning on a previous occasion without incident (T2 at 74-75); (2) the masked officer did not draw a weapon in the interview room or make any threats (T2 at 78); and (3) his fears of being harmed were based on his own perception of what was happening and not any actual physical force meted out against him by the police. (T2 at 81).  Willis testified that he did sign the statement prepared by the officer, but did so out of fear and did not read the statement before signing. (T2 at 54).  However, when the officer returned to the room and asked Willis to sign the waiver of rights form, he refused.  T2 at 85.

6

## Discussion

### 1.  Defendant's Motion to Suppress Evidence.

The Initial Detention:  Counsel agree that the primary issue to be determined with respect to the June 29, 2005 encounter is whether Officer Briganti had the right to secure, detain and re-locate Willis from his car to the Weld street residence while the search of the dwelling was being conducted.  Government counsel initially sought to justify the detention of Willis under the authority of Michigan v. Summers, 452 U.S. 692 (1981).[1]  I believe Willis' detention is more appropriately evaluated as an investigatory stop made pursuant to Terry v. Ohio, 392 U.S. 1 (1968) and hence will measure the legality of the police conduct under the Terry paradigm.

In Terry, the Supreme Court held that an officer may conduct a brief investigatory stop when the officer has a reasonable and articulable suspicion that criminal activity is afoot.  Terry, 392 U.S. at 30.  In determining whether a Terry stop was supported by reasonable suspicion, a court must take into account the totality of the circumstances viewed "through the eyes of a reasonable and cautious police officer on the scene [and] guided by his experience and training."  United States v. Bayless, 201 F.3d 116, 133 (2d Cir. 2000)(citation omitted).  "Reasonable suspicion is an objective standard; hence the subjective intentions or motives of the officer

---

[1] In Michigan v. Summers, the Supreme Court held that the police have the authority to detain occupants found in the premises while a search warrant is executed, regardless of individualized suspicion.  Michigan v. Summers, 452 U.S. at 704-705.

7

making the stop are irrelevant." Id.

Here, the evidence adduced at the hearing demonstrated: (1) that prior to the search police had identified Willis as residing at 140 Weld Street; (2) the search team had been informed of Willis' physical description prior to commencing the search; (3) at least three controlled drug transactions had been consummated at 140 Weld Street prior to the search, including one an hour prior to the commencement of the search; (4) once Officer Briganti approached the vehicle he knew that Willis' physical appearance matched the pre-search description given as to the resident of 140 Weld Street; and (5) after initiating conversation with Willis, Officer Briganti confirmed that Willis "lived" at 140 Weld Street and had arrived at his dwelling intending on entering the residence.

Viewing the totality of the circumstances on June 29, 2005 through Officer Briganti's eyes, it was reasonable for him to conclude that Willis was the resident of a dwelling where repeated drug sales were occurring and intended on returning to and entering his home. I find that Willis' known connection with the residence provided ample justification to believe that he may be associated with drug trafficking occurring at his own home and thus the investigatory stop was proper. The fact that Willis was placed in handcuffs does not alter the Terry analysis. See United States v. Miller, 974 F.2d 953, 957 (8th Cir. 1992) (use of handcuffs did not in itself transform Terry stop into arrest); Dempsey v. Town of Brighton, 749 F.Supp. 1215, 1223 (W.D.N.Y. 1990)("the handcuffing of

a suspect does not convert a stop into an arrest"), aff'd. without opinion, 940 F.2d 648 (2d Cir.), cert. denied, 502 U.S. 925 (1991). Briganti was alone when he encountered Willis, an unusually large man whose home was the center of known drug trafficking. Willis could see that police were already in or at least around his home and securing him with handcuffs as a precautionary measure was not unreasonable given the connection between firearms and drug trafficking. See United States v. Becerra, 97 F.3d 669, 671-72 (2d Cir. 1996)(reasonable to suspect that "drug dealers commonly keep firearms on their premises as tools of the trade")(citation omitted).

Nor does the fact that Willis was escorted a short distance from his parked car into his home pending further investigation convert the detention into an arrest for which probable cause was required. See United States v. Gori, 230 F.3d 44, 56 (2d Cir. 2000) ("it is well established that officers may ask (or force) a suspect to move as part of a lawful Terry stop"); United States v. Charley, 396 F.3d 1074, 1080 (9th Cir. 2005)("[P]olice may move a suspect without exceeding the bounds of an investigative detention when it is a reasonable means of achieving the legitimate goals of the detention given the specific circumstances of the case")(internal quotations omitted). See generally 4 Wayne R. LaFave, Search and Seizure § 9.2(g), at 348 (4th ed. 2004)("[I]t seems clear that some movement of the suspect in the general vicinity of the stop is

9

permissible without converting what would otherwise be a temporary seizure into an arrest.").

Finally, "the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion." United States v. Place, 462 U.S. 705, 709 (1983). Here, Willis testified that only a few minutes passed before Briganti directed him into his residence. By the time Willis arrived inside 140 Weld Street, the search had revealed the existence of drugs, a weapon, ammunition and documents (including mail) connecting Willis to the premises. At that point, there was probable cause to arrest Willis and the subsequent search of his person which yielded the drugs in his underwear was justified as a search incident to arrest.

2.   Defendant's Motion to Suppress Statements: Willis also moves to suppress his post-arrest statements. In this regard, I credit Officer Post's testimony (which Willis did not deny) that Willis was advised of his Miranda rights before custodial interrogation began. Nova v. Bartlett, 211 F.3d 705, 708 (2d Cir. 2000)(confession made post-Miranda admissible at trial).

There remains the issue of whether Willis' statement was voluntary. "A confession is admissible under the Constitution only if it is made voluntarily." United States v. Orlandez-Gamboa, 320 F.3d 328, 332 (2d Cir. 2003). The prosecution bears the burden of

demonstrating that a confession was voluntary. <u>Nelson v. Walker</u>, 121 F.3d 828, 833 (2d Cir. 1997). In making the voluntariness determination, the court should consider the "totality of circumstances" surrounding the particular interrogation at issue. <u>Arizona v. Fulminante</u>, 499 U.S. 279, 286 (1991). "Relevant factors that should be considered include the accused's age, his lack of education or low intelligence, the failure to give <u>Miranda</u> warnings, the length of detention, the nature of the interrogation, and any use of physical punishment." <u>Campaneria v. Reid</u>, 891 F.2d 1014, 1020 (2d Cir. 1989).

Based on the hearing testimony, I find that the circumstances of Willis' interrogation were not so coercive so as to render his post-<u>Miranda</u> statement involuntary. To be sure, I found credible Willis' testimony that there were conditions present (having his wrist uncomfortably handcuffed to a chair while a masked officer questioned him) which made him fearful, anxious and upset.[2] But the relevant issue is whether the conduct of the police was <u>so</u>

---

[2] The fact that Officer Post was masked while questioning Willis was not revealed by Post until cross-examination, and even then, Post did not explain why it was necessary for him to wear a mask while conducting his interrogation. A masked police interrogator certainly can be an intimidating presence, and nothing in this Report and Recommendation should be construed as condoning such a tactic as a means of "scaring" a confession from a suspect. Indeed, unless protecting the identity of the interrogator has a legitimate law enforcement purpose, which was not apparent here, it seems to this Court a far better practice to eliminate a tactic that may be unnecessarily intimidating and, under particular circumstances, so psychologically coercive as to be unconstitutional.

overbearing and coercive that any resulting statement was not the product of the defendant's own free will.   United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991).

Here, while the questioning of Willis was done by a masked officer, Willis certainly knew that the police had searched his house pursuant to a warrant, contraband had been found and that the location where he was being questioned was, in fact, police headquarters.   Prior to commencing the questioning, Officer Post identified himself as a Rochester police officer. Although uncomfortable by the awkward location where his hand was cuffed to the chair, Willis was not physically threatened or harmed in any way nor were deceptive tactics or coercive procedures utilized in the questioning.   Willis' testimony revealed that he was not of low intelligence, had previous experience with the police, and the period of interrogation was relatively brief in duration (approximately 30 minutes).   Although Willis testified that he was frightened by the use of the term "gangbanger", he admitted that his fear of the term was not based on anything threatening that his questioners did or said, but on his own perception that "gangbangers" and police fight.   Indeed, the fact that Willis refused to sign the Miranda waiver form when requested by Officer Post is persuasive evidence that the interrogation was not so psychologically coercive that Willis' free will was overborne.   In sum, I find that the conduct of Officer Post, while intimidating,

did not rise to the level of a "coercive and overbearing experience" sufficient to conclude that Willis' statement was not voluntary under the Due Process Clause.   <u>United States v. Bye</u>, 919 F.2d 6, 10 (2d Cir. 1990).   Accordingly, it is my Report and Recommendation that defendant's motion to suppress his statements should be **denied**.

<u>Conclusion</u>

For the foregoing reasons, it is my Report and Recommendation that defendant's motions to suppress be **denied**.

**SO ORDERED.**

_____
JONATHAN W. FELDMAN
United States Magistrate Judge

Dated: June **13**, 2006
       Rochester, New York

13

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed.R. Civ.P. 72(b) and Local Rule 72.3(a)(3).[3]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance.  *See e.g. Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**  *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Government and the Defendant.

**SO ORDERED.**

Jonathan W. Feldman
United States Magistrate Judge

Dated: June **13**, 2006
Rochester, New York

------

[3]  Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. §3161(h)(1)(f) commences with the filing of this Report and Recommendation.  Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the ten days allowed for filing objections has elapsed.  United States v. Andress, 943 F.2d 622 (6th Cir. 1991); United States v. Long, 900 F.2d 1270 (8th Cir. 1990).